Henry J. KIRKSEY, Fred L. Banks, Jr., Credell Calhoun, Hillman Frazier, Henrene Matthews, Carsie A. Hall, Ms. Annie K. Ward, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Dale DANKS, Jr., Mayor and City Commissioner of the City of Jackson; George R. Porter, City Commissioner of the City of Jackson; Luther R. Roan, Jr., City Commissioner of the City of Jackson; City of Jackson, Mississippi, a municipal corporation; Jackson Municipal Democratic Executive Committee; V.H. McDaniel, Chairman of the Jackson Municipal Democratic Executive Committee; Jackson Municipal Republican Executive Committee; Jackson Municipal Election Commission; Jackie Povall, Bernice Denmar, and Minnie Gay Boyles, Members of the Jackson Municipal Election Commission, Defendants.

Civ. A. No. J83–0077(B).

United States District Court,
S.D. Mississippi,
Jackson Division.

May 10, 1985.

1450

Nausead Stewart, Lawyers' Committee for Civil Rights Under Law, Jackson, Miss., Frank R. Parker, William L. Robinson, Patricia M. Hanrahan, Lawyers' Committee for Civil Rights Under Law, Washington, D.C., for plaintiffs.

John Hedglin, City Attorney, City of Jackson, Jackson, Miss., for defendants.

Jerris Leonard, Kathleen Heenan McGuan, Jerris Leonard & Associates, Washington, D.C., for D. Danks, L.R. Roan, G.R. Porter & City of Jackson.

## MEMORANDUM OPINION AND ORDER

BARBOUR, District Judge.

This case is presently pending before the Court on Motion of the Plaintiff for an award of attorney's fees and litigation expenses. Litigation by black voters of Jackson challenging at-large city council elections has gone on for seven and a half years.

Jackson, Mississippi adopted a commission form of government with at-large elections in 1912, and since then no black candidate has been elected to the three-member Jackson City Council, despite the fact that Jackson is now 47 percent black in population. In February, 1977, pursuant to the provisions of *Miss. Code Ann.* § 21–8–3 (Supp.1983), the City of Jackson had a referendum on changing the form of city government to a mayor-council form of government with nine council members elected by ward, and the referendum failed to pass, with 56 percent of the voters of Jackson voting against the change. Following the defeat of that referendum, 17 black voters of Jackson filed *Kirksey v.*

*City of Jackson*, 461 F.Supp. 1282, 1285 (S.D.Mis.1978), *vac'd and remanded on other grounds*, 625 F.2d 21 (5th Cir.1980), *on remand*, 506 F.Supp. 491, 503 (S.D. Miss.1981), *aff'd.* 663 F.2d 659 (5th Cir. 1981) (*Kirksey I*) alleging that at-large city council elections unlawfully diluted black voting strength in violation of their rights secured by the Thirteenth, Fourteenth and Fifteenth Amendments and Federal voting rights statutes.

There were two separate trials in that case, and after each trial the District Court dismissed the case because plaintiffs had failed to prove that at-large elections were adopted or maintained with discriminatory intent, either under the discriminatory intent standard of *Nevett v. Sides*, 571 F.2d 209 (5th Cir.1978), or *City of Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

In June, 1982 Congress amended Section 2 of the Voting Rights Act of 1965 to eliminate the requirement of proving discriminatory intent and to substitute a more liberal "results" test to prove a statutory violation. To take advantage of this change in the law and intervening Supreme court decisions on the intent standard, see *Kirksey v. City of Jackson*, 714 F.2d 42 (5th Cir.1983) (*Kirksey I*), Plaintiffs filed this case (*Kirksey II*) on February 7, 1983, as a new lawsuit. They alleged that at-large city council elections in Jackson have been imposed or applied in a manner which results in a denial or abridgement of the right to vote in violation of Section 2, as amended in 1982, and also that at-large voting has been maintained for a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments and 42 U.S.C. § 1983.

The Plaintiffs requested declaratory and injunctive relief against further at-large city council elections, and a change in the form of city government to a mayor-council form of government with council members elected from single-member districts or wards.

Extensive litigation followed. Defendants objected to the majority of Plaintiffs' first set of interrogatories and strenuously resisted providing answers on the theory that any relitigation of the issues previously litigated in *Kirksey I* was barred by the doctrines of res judicata and collateral estoppel. The Magistrate sustained these objections and on appeal the Magistrate's decision was overruled and Defendants were ordered by this court to answer. Memorandum Opinion and Order, Nov. 7, 1983.

Plaintiffs then moved to amend their complaint to allege that at-large voting had been maintained for a discriminatory purpose and sought to allege the results of the 1977 referendum in support of their contention. Again, Defendants objected to this amendment as an effort to relitigate issues decided in *Kirksey I*. The Magistrate allowed Plaintiffs to amend their complaint to allege discriminatory purpose, but refused to permit Plaintiffs to allege facts surrounding the 1977 referendum, and again on appeal this Court overruled the Magistrate's decision and allowed Plaintiffs to amend their Complaint. Order of Jan. 12, 1984.

After a change in counsel for the Defendants, a new attorney for the Defendants filed a Motion for Summary Judgment and a Motion for stay of discovery which, for the third time, alleged that Plaintiffs should not be permitted to litigate issues previously litigated in *Kirksey I*. Once again, this Court rejected this theory, denied both motions, and ordered the Defendants to pay a sanction of $250 to the Clerk and $1,089.96 in attorneys' fees and expenses to the Plaintiffs pursuant to Rule 11 of the Federal Rules of Civil Procedure. Order Denying Motions and Imposing Sanctions, June 26, 1984; Order of August 21, 1984.

Plaintiffs also undertook extensive discovery. Plaintiffs filed three sets of interrogatories, a request for admission of facts and documents, and a request for production of documents, and deposed the Defendant city council members and their expert witnesses. Defendants also served interrogatories and deposed Plaintiffs' expert witnesses prior to trial.

In July, 1984, Plaintiffs and two of the three city council members, Commissioners George R. Porter and Luther L. Roan, Jr., agreed to a proposed settlement of this action under which the city council would be expanded to five members, with a Mayor elected at-large and four commissioners elected from wards, two of which would be majority white and two majority black. Mayor Dale Danks, Jr., then filed an action in Hinds County Circuit Court and without notice or hearing obtained an *ex parte* order from that court enjoining the two commissioners from taking any action to settle this case. *Dale Danks, Jr., Mayor, v. George R. Porter and Luther L. Roan, Jr., Commissioners*, Docket No. 31,194 (Hinds County Cir.Ct.). That action subsequently was dismissed on July 19, when the two commissioners signed an agreement not to settle this case unless the settlement provided for a referendum on a form of municipal government "that is authorized or may become authorized by state law." Because state law does not presently specifically provide for such form of government, no such referendum was held.

This resolution of *Danks v. Porter* effectively ended the proposed settlement between Plaintiffs and the two commissioners and forced the Plaintiffs to continue their preparation for trial.

The trial commenced on September 4, 1984, and Plaintiffs began their presentation of their case. On the same day, the City of Jackson held another referendum as authorized by *Miss. Code Ann.* § 21–8–3 (1983 Supp.) on a change in the form of city government to a mayor-council form of government with seven council members elected from single-member districts or wards. This time the referendum passed, with 65 percent of those participating voting for the change. The passage of this referendum accomplished the two principle goals of Plaintiffs' lawsuit: (1) it effectively brought an end to at-large voting for the members of the Jackson City Council, and (2) it provided for the election of council members from single-member districts or wards.

■■■ The entitlement of the Plaintiffs to a court award of reasonable attorneys' fees and litigation expenses is determined by reference to both Section 14(e) of the Voting Rights Act, 42 U.S.C. § 1973*l* (e), and the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988. 42 U.S.C. § 1973*l* (e) provides:

> In any action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendments, the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Similarly, 42 U.S.C. § 1988 provides in relevant part:

> In any action or proceeding to enforce a provision of sections 1981, 1982, 1984, 1985, and 1986 of this title, title IX of public law 92–318, or title VI of the Civil Rights Act of 1964, the Court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorneys' fee as part of the costs.

In enacting both of these statutes, Congress directed the prevailing parties "should ordinarily recover an attorneys' fee unless special circumstances would render such an award unjust." S.Rep. No. 94–295, 94th Cong., 1st Sess. 40 (1975), *reprinted in* 1975 U.S.Code Cong. & Ad. News 774, 807 (Section 1973*l* (e); S.Rep. No. 94–1011, 94th Cong., 2d Sess. 4 (1976), *reprinted in* 1976 U.S.Code Cong. & Ad. News 5908, 5912.[1]

■■■ Plaintiffs are "prevailing parties" within the meaning of these statutes when they accomplish the goals of their litigation

---

**1.** Because these two statutes employ almost identical language and are very similar in their purposes, they would be construed in similar fashion. *Riddell v. National Democratic Party*, 624 F.2d 539, 543 (5th Cir.1980). Also, the legislative history of the 1982 amendment to Section 2 of the Voting Rights Act makes clear that minority voters are entitled to court awards of attorneys' fees under these statutes for enforcing their Section 2 rights. H.R.Rep. No. 97–227, 97th Cong., 1st Sess. 32 (1981).

even though they obtain no judicial relief. The legislative history of both statutes make it clear that Congress intended that a litigant may prevail outside of the courts and still be eligible for a fee award:

> For the purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief.

S.Rep. No. 94–1011, *supra*, 5, 1976 U.S. Code Cong. & Ad.News 5912 (§ 1988); S.Rep. No. 94–295, *supra*, 41, 1975 U.S. Code Cong. & Ad.News 808 (§ 1973*l* (e)). As the Supreme Court noted in *Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980):

> Nothing in the language of § 1988 conditions the district Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiffs' rights have been violated.

Thus, plaintiffs in voting rights cases are entitled to a fee award even "when subsequent remedial action by the defendant effectively moots the controversy after the lawsuit has been filed." *Connor v. Winter,* 519 F.Supp. 1337, 1340 (S.D.Miss.1981) (three-judge court); *see also, Ramos v. Koebig,* 638 F.2d 838, 845–46 (5th Cir.1981). When plaintiffs' cause of action is rendered moot by unilateral action of the defendant, plaintiffs may recover fees by showing

> a causal connection between the filing of the suit and the defendant's action and that the defendant's conduct was required by law, *i.e.,* not a wholly gratuitous response to an action that in itself was frivolous or groundless.

*Williams v. Leatherbury,* 672 F.2d 549, 551 (5th Cir.1982). Such a "causal connection" is present when plaintiffs show that the lawsuit was "a substantial factor or significant catalyst" in motivating the defendant to end the challenged conduct. *Wooten v. Housing Authority of City of Dallas,* 723 F.2d 390, 391 (5th Cir.1984); *see also Robinson v. Kimbrough,* 620 F.2d 468, 478 (5th Cir.1980) (plaintiffs may recover if "their lawsuit was a significant catalytic factor in achieving the primary relief sought through the litigation."); *Connor v. Winter,* 519 F.Supp. at 1339–40. The inquiry is "an intensely factual, pragmatic one" involving an analysis of the "chronology of events" and all other factors bearing on the issue, recognizing that "defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways." *Posada v. Lamb County,* 716 F.2d 1066, 1072 (5th Cir.1983) (citations omitted).

■ The history of this litigation clearly shows that this lawsuit was a "substantial factor" and a "significant catalyst" in producing the September 4 referendum result. Prior to the filing of *Kirksey I* a referendum on a change in the form of city government was held and the referendum was defeated. The referendum did not pass until after this lawsuit was filed and Jackson was "under the gun."

The newspaper articles submitted with the motion of the Plaintiffs show that the major actors responsible for the passage of the September 4 referendum were aware of this litigation and stated openly that if the change was not accomplished by the referendum, it would be done by the federal court in this litigation. On the day after this lawsuit was filed, the Jackson City Council announced that it proposed a citizens' task force to gather the 12,000 signatures needed to call a referendum on changing the city's form of government.

> Mayor Dale Danks, Jr. said the citizens of Jackson and "not a federal court judge" should decide what form of government their city should have. Danks said the council doesn't have the authority to call such an election on its own.

> "I feel the people of this city should have the right to vote on their form of government," Danks said. "I would encourage those who prefer the litigation route—I would suggest that those efforts would be better spent gathering signatures on a petition so we can all go the polls and vote."

"City Council May Seek Referendum on Form of Government," Jackson *Clarion-*

*Ledger,* Feb. 9, 1983. The referendum effort was dormant until after the February, 1984 special election in which a black candidate who made the runoff election, Ms. Shirley Watson, was defeated by a white candidate, George Porter, in an election characterized by a high degree of racially polarized voting. Watson's defeat was reported by the Jackson newspapers as adding additional support to Plaintiff Kirksey's argument in this case that at-large elections prevent the election of black candidates to the city council. "Watson's Defeat May Aid Push for New Form of City Government," *Clarion-Ledger-Jackson Daily News,* Feb. 19, 1984; Jack Elliott column, "Black Candidates Lost the Battle, But Might Win the War," *Clarion-Ledger-Jackson Daily News,* Feb. 19, 1984. Less than week after the special runoff election, Mayor Dale Danks appointed an 87–member advisory committee to study whether the city's form of government should be changed. The newspaper article specifically mentioned this lawsuit and reiterated Mayor Danks' view that the issue should be decided by a referendum rather than in this case:

> The city's current government, a three-member commission elected at large, is being challenged in federal court by a group of black residents, who contend it keeps blacks out of City Hall by diluting minority voting strength.
>
> No blacks have been elected to the council since the commission form was adopted in 1912.
>
> Opponents renewed their attacks on the form of government after last week's election, saying the victory of George Porter over Shirley Watson proved that blacks will not be elected to the council until at-large elections are abandoned and council members are elected from wards.
>
> \*    \*    \*    \*    \*    \*
>
> Danks said, "if the committee deems it's in the best interest to hold a referendum, then so be it."
>
> "It has been my position that the people of this city have the right and the responsibility to choose what form their city government takes, and not have that decision removed from their control by the courts," Danks said.

"Danks Names Panel to Study Change in Form of Government," *Clarion-Ledger,* Feb. 21, 1984.

After public hearings and committee deliberations, this advisory committee recommended a change to mayor-council form of government with seven council members elected by ward. The articles reporting the advisory committee's recommendations referred to this lawsuit. "City Panel Endorses Strong Mayor/Council," *Clarion Ledger,* Mar. 23, 1984; "Vote May be Coming on Larger City Council," *Jackson Daily News,* Mar. 30, 1984. The supporters of the change collected the required number of signatures on their petitions as required by *Miss. Code Ann.* § 21–8–3 (Supp.1983), and the referendum was set by the city council for September 4, the date previously set for the trial in this case.

The ads published in the Jackson newspapers by the group supporting the change, the Committee for the Mayor-Council Form of Government, which were run for at least a week prior to the referendum and on the day of the referendum, gave this lawsuit as the principal reason why the change was needed:

> THE FORM OF GOVERNMENT FOR THE CITY OF JACKSON IS YOUR DECISION ... BUT NOT FOR LONG
>
> \*    \*    \*    \*    \*    \*
>
> On September 4th, the legal challenge against our present form of government will be heard in federal court. It is almost certain that our present form of government *will* be changed, because it has the effect of denying representation to a large segment of our community. A form of government which provides for electing a city council by wards or districts, rather than at large, will become necessary.
>
> It's clear that Jackson will have a new form of government. The only question

is, will we change the form of government ourselves, by a vote, or will we take whatever form the courts decide for us?

*Clarion-Ledger,* Sept. 4, 1984.

Both Jackson newspapers published editorials supporting passage of the referendum. The *Clarion-Ledger* referred to "a federal gun pointed at Jackson's head," editorial, "Jackson's Future," Aug. 30, 1984, and the *Jackson Daily News* stated: "A court-imposed change of government appears inevitable if Jackson fails to change its form of government to one of its own choice. Court orders have denied voters in other cities—most recently Greenwood—the right to make that choice," editorial, *Politics Aside,* Aug. 30, 1984.

On the Sunday before the referendum vote, the Jackson newspapers published the views of the three city council members and other leading citizens. In this forum piece, Mayor Danks cited this litigation as a major reason why the referendum should be adopted:

Third, I am for the people of Jackson having the right to select the mayor-council form of government. You can be sure that a federal court will do it for us, and we may not like what we get.

"Should Jackson Change Its Form of Government?," *Clarion-Ledger-Jackson Daily News,* Sept. 2, 1984.

This chronology, and these comments by Mayor Danks throughout the referendum effort, show the required "causal connection" between this lawsuit and the change, and that the plaintiffs, as prevailing parties, are entitled to their attorneys' fees and litigation expenses.

Having reached the initial determination that the Plaintiffs are entitled to attorney's fees, this Court must determine the fee which is "reasonable." *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983). Following the outline contained in the opinion of the Supreme Court in *Hensley v. Eckerhart,* the starting point for this Court's inquiry will be the number of hours reasonably expended on this litigation multiplied by a reasonable hourly rate. The two attorneys responsible for the representation of Plaintiffs in this action are Frank R. Parker and Patricia N. Hanrahan. Mr. Parker requests 315.69 hours at the hourly rate of $135.00 per hour. Ms. Hanrahan requests 175.7 hours at an hourly rate of $100.00 per hour. Both attorneys have travel time which they request at a reduced rate. Mr. Parker requests 56 hours of travel time at $67.50 per hour and Ms. Hanrahan requests 21.5 hours of travel time at $50.00 per hour. In addition to the attorney's fees, the Plaintiffs request an award for paralegal work totalling $6,207.00. Total litigation expenses for which the Plaintiffs request reimbursement are $35,298.52. The total of the request, including attorney's fees, paralegal work and litigation expenses is $106,548.67. The only objections interposed by the Defendants is that the hourly rates claimed are unreasonable and that some litigation expenses and costs are inadequately documented or were not in fact incurred in preparation for trial. No hearing has been requested on these controverted matters and accordingly this Court will proceed to decide them on the basis of the material presented by both parties in support of and in opposition to the Motion for Attorney's fees.

The number of hours which has been requested by the attorneys is certainly not unreasonable for a case as complex involving as many variables as this litigation. The Defendants have made no objection to the number of hours requested. The attorneys have provided this Court with fully detailed and documented affidavits requesting a total of 568.89 hours of legal work including the 77.5 hours of travel time. This represents the work of two attorneys over a period of 18 months of litigation. This Court finds that the Plaintiffs' request is reasonable in light of the total number of hours required to prepare for this litigation. The affidavits of the attorneys for the Plaintiff show no indication that the hours claimed were not reasonably expended in the pursuit of the objectives sought by the Plaintiffs. Likewise,

there appears to be no duplication of hours and the Plaintiffs have specifically deleted any hours for which compensation has already been granted pursuant to the order of this Court imposing sanctions and attorney's fees on the Defendant for requiring the Plaintiff to repeatedly respond to an issue on which this Court had ruled.

The next step in the analysis of this Court is the determination of the appropriate hourly rate to which the Plaintiffs are entitled. The attorneys for the Plaintiffs argue that they are entitled to the prevailing rate for the District of Columbia instead of those which are customary in the Jackson area. The reason advanced for this position is that the Plaintiffs were required to go outside of the Jackson area in order to obtain the expertise necessary to the success of this litigation. Additionally, the Plaintiffs argue that the City of Jackson itself went to attorneys in the District of Columbia paying lead counsel rates of $125.00 an hour and an associate only three years out of law school $100.00 an hour. They advance this argument as an additional reason for granting them the increased hourly rate.

While this Court does not comment on the wisdom of the officials of the City of Jackson in paying attorneys from the District of Columbia at the above quoted hourly rates, especially considering the limited experience of an attorney who has been out of law school only three years, this does not justify burdening the taxpayers with yet another set of attorneys fees at the hourly rate which prevails in the District of Columbia. This Court is convinced of Mr. Parker's expertise and in no way denigrates his abilities. However, the prevailing rate in the City of Jackson for one of Mr. Parker's abilities is $100.00 per hour and for those of Ms. Hanrahan are $60.00 per hour. It has been the experience of this Court that there are attorneys in the Jackson area who could handle this litigation for the Plaintiffs. This Court does not find that it was necessary for the Plaintiffs to go outside the Jackson area in order to retain counsel to prosecute this litigation. Accordingly, it is the determination of this

Court that Mr. Parker should be compensated at the hourly rate that prevails for one of his expertise in this area, being $100.00 per hour and Ms. Hanrahan likewise at the rate of $60.00 per hour. These rates are consistent with the prevailing rates in this district. *See Morrow v. Finch,* 642 F.2d 823 (5th Cir.1981) (awarding Mr. Parker $100.00 per hour); *Pendleton v. Hood,* No. J83–0519(B) (S.D.Miss. July 19, 1984) (awarding Ms. Hanrahan $60.00 per hour). This Court has taken into consideration other awards and has also considered the 12 *Johnson* factors which will be set forth in detail *infra.*

■ This Court further finds that an hourly rate at one-half of the normal rate is appropriate for travel time for both attorneys Parker and Hanrahan. This is consistent with the normal fees charged by attorneys in this district. The result of computations on the basis of the hourly rates set forth above is an attorney's fees award of $45,556.00 calculated as follows:

| Attorney | Hours/rate | Total |
|---|---|---|
| Frank R. Parker | 315.69 @ $100 | $31,569.00 |
| (Travel Time) | 56 @ $50 | 2,800.00 |
| Patricia M. Hanrahan | 175.7 @ $60 | 10,542.00 |
| (Travel Time) | 21.5 @ $30 | 645.00 |
| TOTAL ATTORNEY'S FEES ALLOWED | | $45,556.00 |

■ This, of course, is the lodestar figure. The next step in this Court's analysis will be an in-depth examination of the *Johnson* factors. Many of these twelve factors have been tacitly considered by this Court in arriving at the initial "lodestar" figure determining the number of hours reasonably expended and the reasonable hourly rate. *See Hensley v. Eckerhart,* 461 U.S. at 434 n. 9, 103 S.Ct. at 1949 n. 9.

The first of the factors is the time and labor required. Of course, this is the factor which the Court has considered above in arriving at the lodestar figure. Mr. Parker and Ms. Hanrahan maintained detailed records setting forth the date, the work performed and the hours entailed in accomplishing that work. This Court is satisfied that such hours were reasonable and should be included in the total number

of hours allowed in the calculation of the lodestar figure.

The second *Johnson* factor is the novelty and difficulty of the questions presented by this lawsuit. There is no doubt but that this lawsuit was more than simply routine litigation. There were difficult challenges by the Defendants on the basis of res judicata and collateral estoppel principles arising out of the previous litigation in *Kirksey I*. The Plaintiffs were forced to make two applications for review of Magistrate's Orders and additionally defend against the same issue on a motion for summary judgment made by the Defendants. The Plaintiffs were successful in all respects on these legal issues. Additionally, the Plaintiffs' attorneys were familiar with this litigation by virtue of their involvement with the previous lawsuit attacking the at-large election system of the City of Jackson (*Kirksey I*).

This was one of the early lawsuits filed pursuant to the 1982 amendments to Sections 2 of the Voting Rights Act of 1965. There were novel questions of the burden of proof and the factors needed for presentation of a prima facie case. All indications are that the Plaintiffs were prepared to proceed through a full blown trial of these issues. The fact that a referendum was scheduled for the same day as the trial should not preclude the Plaintiffs from recovering for all time appropriately spent preparing to present this case to the Court should that have become necessary.

The third *Johnson* factor is the skill required to perform the legal services properly. It is a widespread opinion of the federal courts both in this district, the Northern District of Mississippi, the United States Court of Appeals for the Fifth Circuit and the federal courts in the District of Columbia that Mr. Parker is one of the preeminent attorneys in the field of voting rights. He has had extensive academic and practical experience in this field. The clarity with which issues were presented and focused for decision by this Court is testimony to the expertise of Mr. Parker and his associate Ms. Hanrahan.

The fourth factor for this Court to consider is the preclusion of other employment. The attorneys for the Plaintiff gave this case a high priority effectively preventing them from accepting additional cases from June of 1984 to September of 1984. While not precluding entirely other employment during the period of the pendency of this lawsuit, it is clear that acceptance of the responsibility for this litigation limited other employment to some degree even prior to the critical period during the summer and fall of 1984.

The fifth factor for this Court to consider is the customary fee. The Lawyers Committee for Civil Rights Under Law accepts voting rights cases on a non-fee basis. The organization is largely dependent on court awards of attorney's fees. As previously set forth, this Court has taken this factor into consideration in determining the lodestar figure. Mr. Parker has been awarded fees on a non-contingent hourly rate of $100.00 per hour in many cases in this district. While he has received awards as high as $135.00 per hour in cases in the District of Columbia, this Court has determined that the appropriate hourly rate for this case should be that which prevails in this district and not in the District of Columbia.

The sixth factor is whether the fee was fixed or contingent. Because the Lawyers Committee for Civil Rights Under Law is a private, charitable, civil rights, legal organization accepting cases involving constitutional civil rights of minority and poor persons on a non-fee generating basis, no fee arrangement is made with the clients of that organization. In that respect this case was a contingent fee case because the award of attorney's fees is contingent upon the success of the plaintiffs. However, the experience of the attorney for the Plaintiffs in the previous Jackson form of government lawsuit (*Kirksey I*) provided Mr. Parker with the insight and knowledge that success in this litigation was much more likely than not.

The seventh factor for consideration by this Court is time limitation imposed by the

client or the circumstances. Because this lawsuit involved voting rights seeking changes in the form of government, certain time limitations were inevitable. Additionally, because of the length of time that this litigation had been pending either in the form of this lawsuit or the previous one, a speedy resolution was important. The Plaintiffs' attorneys state that this case has been handled on a priority basis. It is evident to this Court that such was the case in that the Plaintiffs prosecuted this lawsuit diligently and responsibly against the dilatory tactics of the Defendant.

The eighth factor entails an evaluation of the results obtained. As set forth above this Court finds that this lawsuit was the one major factor causing the petition drive and referendum election ultimately changing the form of government for the City of Jackson.

The ninth factor is the experience, reputation, and ability of the attorneys. As with many of the factors this also has been considered by the Court in determining the reasonable hourly rate to be allowed by this Court. It is clear that Mr. Parker has a long history of experience in the field of voting rights and is entitled to receive an hourly fee commensurate with that of a senior partner in a law firm. Mr. Parker has had not only an outstanding academic career but has also had experience in civil rights and voting rights cases. He is extensively published and has participated in many important cases affecting this field. His abilities have been recognized by many courts in passing on the appropriate attorney's fee award.

The tenth factor is the undesirability of this case. Because Mr. Parker is a specialist in this area of litigation this case was not undesirable; however, it is likely that many attorneys in this area would have found it to be so.

The eleventh factor for this Court's consideration is the nature and length of the professional relationship of the attorneys with their clients. The attorneys have represented the named Plaintiff, State Senator Henry J. Kirksey, in previous cases. All of these lawsuits have involved civil rights litigation, mostly legislative reapportionment and county redistricting lawsuits as well as the previous lawsuit attacking the at-large election of the mayor and councilmen for the City of Jackson. All of these cases have been dependent upon awards of attorney's fees as is this case. Accordingly, the professional relationship has not involved work billed to the client and is not of the nature that provides continuing income. This is not the attorney-client relationship that may result in a reduced fee charged by the attorney.

The last factor is an examination of awards in similar cases. A fee award of $100.00 per hour is close to that which experienced lead counsel has been awarded in similar cases in this district. This is not substantially lower than similar cases outside of this district. *See Graves v. Barnes,* 700 F.2d 220 (5th Cir.1983). Likewise, a fee award for associate counsel based on an hourly rate of $60.00 is consistent with the award this Court has given this particular associate on a previous occasion.

It is the considered opinion of this Court that the results which the Plaintiffs obtained and the expertise which was brought to bear on this case deserves more than the straight award of the hours reasonably expended times a reasonable hourly rate. Accordingly, this Court has considered a multiplier in that this case was essentially on a contingent fee basis and was handled in an expert fashion by experienced counsel with a background in this particular litigation. There were some novel and difficult questions concerning the effect of res judicata and collateral estoppel present in this litigation. The number of hours is less than might ordinarily be expected in a lawsuit of this nature no doubt largely due to the attorney's familiarity with the facts and circumstances of this case as a result of his exposure in the previous litigation attacking the form of government of the City of Jackson. Additionally, every point and issue has been litigated with vigor by the Defendants. Indeed, the litigiousness of the Defendants has been evidenced by

this Court's previous decision imposing sanctions for filing a frivolous motion for summary judgment.

In all, it is the determination of this Court that the attorneys for the Plaintiff are entitled to a multiplier for the excellent results achieved, the skill brought to bear on this litigation and the obstacles overcome in litigating this lawsuit. The attorney's fees will be increased by 25% in accordance with this finding. The calculation of this adds $11,389.00 to the total award of attorney's fees. This makes a total award of $56,945.00.

The Plaintiffs have also requested an award for legal work done by law students in a paralegal capacity. Deborah James spent 29.4 hours and Mark Haddad spent 177.5 hours working in a paralegal capacity. The Plaintiffs have requested compensation at an hourly rate of $30.00 per hour. This rate is entirely consistent with awards for paralegal work, especially where this reduces the amount of time the attorneys are required to spend researching and doing other work normally required of an attorney. Accordingly, this Court will allow the paralegal work at the rate requested. This award is as follows:

| Attorney | Hours Legal/rate | Total |
|----------|------------------|-------|
| Deborah James | 29.4 @ $30.00 | $ 882.00 |
| Mark Haddad | 107.5 @ $30.00 | 5,325.00 |
| TOTAL PARALEGAL FEES | | $6,207.00 |

■ The Defendants have objected to some of the litigation expenses and costs on the basis that they are inadequately documented or were not in fact incurred in preparation for this trial. The first item objected to is the fee for an expert witness, John Grimm, of $5,319.77. Mr. Grimm was retained by the Plaintiffs to do a survey of voter motivation in the 1977 referendum for presentation at the re-hearing of *Kirksey I*. The testimony of Mr. Grimm was excluded for failure of the Plaintiffs to follow the appropriate procedure in presenting it. The Plaintiffs argue that this testimony and the results of the survey were probative in the context of the present litigation to show racial motivation

of white voters who voted against the referendum in 1977 seeking to change the form of government of the City of Jackson. It is clear that the work done by Mr. Grimm was completely transferable and it is inefficient to require the Plaintiffs to gather the same information again and incur the expense a second time where nothing would be gained by doing so. Accordingly, it is the determination of this Court that this expense should be allowed in its entirety. The decision of this Court to allow this expense is based in large part on the care with which this Petition for Attorney's Fees has been presented. The Plaintiffs have not requested any compensation in any form for fees and expenses incurred in the previous lawsuit which resulted in an adverse decision. This appears to be the only exception of an expense incurred in the previous lawsuit which was to be utilized in the present litigation. As such, this Court is not in a position to disallow this expense solely for the reason that it was developed for purposes of the prior litigation where it appears to the satisfaction of this Court that it would have been used as probative evidence in the trial of this case should it have been necessary to complete the trial.

The Defendants have objected to long distance telephone charges on the basis of lack of documentation. The total amount for long distance telephone calls requested by the Plaintiffs to which to the Defendant have objected is $357.68. The Plaintiffs have provided this Court with detailed documentation of almost every expense which has been requested. The Plaintiffs have attached business records reflecting documentation for the $357.68. This Court is satisfied that these records substantiate the request and will not require any further documentation. The $357.68 will be allowed. The Defendants have also objected to $297.68 of telephone charges included in hotel bills. The Plaintiffs have decided to forego any request for reimbursement of these expenses and accordingly this Court will not decide the issue.

The Defendants also object to $1,913.14 for car rental. The cars were used by the Plaintiffs' attorneys on trips to Jackson both preliminarily to trial and during the trial period. While it is certainly true that the Plaintiffs' attorneys could have been lodged within walking distance of the courthouse, it is often necessary for an out-of-town attorney to have access to transportation and it is reasonable to rent a vehicle for those purposes, particularly in a city such as Jackson which does not have an extensive public transportation system. This Court will not disallow the expense of car rental on the basis argued by the Defendants.

In summary, the Plaintiffs request total expenses of $35,298.52. All of these expenses will be allowed except for $297.68 in long distance telephone calls which were charged to hotel bills. The disallowance of this amount results from a concession by the Plaintiff and the award of litigation expenses will be reduced accordingly. The resulting amount which will be allowed is $35,000.84.

In accordance with the above this Court will allow the following:

| | |
|---|---|
| Attorneys Fees | $56,945.00 |
| Paralegal fees | 6,207.00 |
| Expenses | 35,000.84 |
| TOTAL | $98,152.84 |

A judgment for this amount will be entered consistent with the above findings of this Court together with interest from this date until paid in full.

The final remaining issue before this Court is whether or not this case should be finally dismissed as moot. It is clear that the Plaintiffs do not contest such a dismissal as the only remaining question of attorney's fees has been answered above. Accordingly, this Court shall enter final judgment dismissing this lawsuit as moot and awarding attorney's fees, paralegal fees and litigation expenses of $98,152.84 by separate document consistent with Rule 58 of the Federal Rules of Civil Procedure.