METROPOLITAN PITTSBURGH CRU-
SADE FOR VOTERS, and unincorpo-
rated membership organization, Thom-
as E. Smith, Florence Bridges, Roy A.
Holmes, Reginald D. Plato, Isaac J.
Saxon, Claude J. Jones, Isaac Wade,
Ronald L. Suber, and Marshall Ross,
Plaintiffs,

v.

CITY OF PITTSBURGH, PENNSYLVA-
NIA, a municipal corporation; Richard
Caliguiri, Mayor, Eugene DePasquale,
Ben Woods, Mark Pollock, Sophie Mas-
loff, Michell Madoff, Richard Givens,
Stephen Grabowski, Jack Wagner,
James O'Malley, members of the Pitts-
burgh City Council; Allegheny County
Board of Elections; Tom Forester, Pete
Flaherty, Barbara Hafer, Commission-
ers; Allegheny County Democratic
Committee; Edward Stephens, Chair-
man; Allegheny County Department of
Elections; James Scanlon, Director,
Defendants.

Civ. A. No. 86–173.

United States District Court,
W.D. Pennsylvania.

Dec. 27, 1989.

See also 686 F.Supp. 97.

Thomas J. Henderson, Pittsburgh, Pa., William L. Robinson, and Samuel Issacharoff, for plaintiffs.

Robert L. Byer, Pittsburgh, Pa., Allan J. Opsitnick, Verona, Pa., Robert B. Smith, Vincent R. Fontana, New York City, and John F. Cambest, Pittsburgh, Pa., for defendants.

## OPINION

ZIEGLER, District Judge.

The Metropolitan Pittsburgh Crusade for Voters and nine individuals filed this civil action for declaratory and injunctive relief on January 22, 1986 on behalf of all black residents in the City of Pittsburgh. Upon the motion of plaintiffs, the court certified a class of "All black citizens of the City of Pittsburgh, Pennsylvania" pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure. At the commencement of this action, an estimated 24 percent of the population of the City of Pittsburgh was black, yet no black was serving on the City Council at that time.

Plaintiffs alleged in their complaint that the at-large elections of the City Council of Pittsburgh diluted black voting strength in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution, Section 2 et seq. of the Voting Rights Act of 1965, as amended in 1982, 42 U.S.C. § 1973 et seq., and 42 U.S.C. § 1983. The class sought an injunction to enjoin defendants from conducting at-large elections and an order to adopt a by-district system for election of members of Council.

In 1981, a referendum was submitted to the voters of the City of Pittsburgh permitting them to choose between maintaining the nine member at-large system, changing to a nine member by-district system or establishing a seven member by-district and two member at-large system of electing City Council persons. The voters determined to maintain the at-large system by a margin of 289 votes. *See* Affidavit of Fontana, Exhibit D. The predominantly black wards with one exception voted to maintain the at-large system despite the fact that under that system, only six black persons had served on City Council since 1911.

In 1982, certain concerned voters petitioned the Allegheny County Department of Elections to place a referendum on the November, 1982 ballot authorizing a change to a by-district system of electing persons to City Council. Opponents of the referendum filed an action in the Court of Common Pleas of Allegheny County, Pennsylvania, alleging, *inter alia*, that the referendum failed to comply with the Home Rule Charter and Optional Plans Law, 53 P.S. § 1–101 *et seq.*

The Court of Common Pleas held that the proposed referendum could not be placed on the ballot because the referendum proposed a change in the form of government and state law did not authorize such a procedure. Rather, in order to effect a change, the voters were required to elect a government study commission with power to establish a council by districts pursuant to 53 P.S. § 1–207. *In re: Petition for Referendum to Amend Home*

*Rule Charter of City of Pittsburgh,* 130 P.L.J. 466 (Allegheny County 1982).

City Council later raised the question whether it had the power to change the at-large system to by-district elections, but the Solicitor, Dante R. Pellegrini, concluded in a written opinion to Council that the change had to be implemented through the election of a government study commission in accordance with state law and the opinion of the Court of Common Pleas of Allegheny County. Affidavit of Fontana, Exhibit E.

In 1985, a community group was formed to advance the concept of electing council members by-district and on October 7, 1985, State Representative Thomas Murphy introduced House Bill 1731, which authorized the voters of the City of Pittsburgh and other home rule municipalities to change their system of electing council members without creating a government study commission to implement such a change. Affidavit of Fontana, Exhibit F. State Senator James Romanelli introduced an identical bill in the Senate. On January 22, 1986, plaintiffs filed the instant action. In the meantime, the Murphy–Romanelli Bill was enacted in November, 1986, effective January 1, 1987. 53 P.S. § 1–221(b).

A referendum was placed on the ballot for the primary election on May 19, 1987 and the voters elected to amend Section 302 of the Home Rule Charter to provide for by-district elections for Council. The trial on the merits of this action was scheduled to commence on June 1, 1987, but in light of the results of the referendum, the parties reached a settlement agreement on that date and executed a consent order on June 10, 1987. *See* Transcript of Hearing of June 4, 1987.

The consent order provided that defendants were admitting no liability for alleged violation of plaintiffs' voting rights. The parties further agreed that the Apportionment Commission formed pursuant to 53 P.S. § 1–221(d) would present its final apportionment proposal to this court, in writing, on or before February 15, 1988. At that time, the court would conduct a fairness hearing to insure compliance with

Section 2 of the Voting Rights Act, the Fourteenth and Fifteenth Amendments, and to hear any objections to the proposed plan. At the urging of plaintiffs, the parties stipulated that this court would retain jurisdiction to review any reapportionment that takes place after the 1990 Census is completed, if necessary. After two fairness hearings, we determined that the redistricting plan provided the black citizens of the City of Pittsburgh with a proportionate opportunity to elect representatives of their choice to City Council. All objections were denied.

Presently before the court is the motion of plaintiffs for partial summary judgment on the issue whether they are prevailing parties within the meaning of 42 U.S.C. §§ 1973*l*(e) and 1988. Although the statutes make fee awards discretionary, that discretion is limited. A prevailing party should ordinarily recover attorney fees "unless special circumstances would render such an award unjust." *Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). Both statutes allow the court, in its discretion, to award reasonable fees and costs to the prevailing party in actions brought to enforce voting rights. Because the language and purpose of the two provisions are nearly identical, we will apply the same precepts for determining prevailing party status under either statute. *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983).

■ Defendants argue that plaintiffs are not prevailing parties because "this lawsuit was not the catalyst for the Pennsylvania State legislature passing Public Law 1456, which enabled the City of Pittsburgh to implement by-district elections; nor was it the catalyst for City Council's actions." Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment at 8. Defendants further assert that the desire and efforts for change to by-district elections pre-date the filing of this action and the only barrier to implementing such elections was the absence of enabling legislation which, when

enacted, resulted in the current system of electing City Council members by district.

The test established by the United States Court of Appeals for the Third Circuit to determine prevailing party status is "whether plaintiff achieved some of the benefit sought by the party bringing suit." *NAACP v. Wilmington Medical Center, Inc.,* 689 F.2d 1161, 1167 (3d Cir.1982), *cert. denied,* 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983); *Clark v. Twp. of Falls,* 890 F.2d 625 (3d Cir.1989). In applying this standard, we must follow two steps. We must compare the relief sought with that actually obtained and then determine the causal connection between the relief obtained and the litigation. *Disabled in Action of Pennsylvania v. Pierce,* 789 F.2d 1016 (3d Cir.1986). "[A]t a minimum, to be considered a prevailing party within the meaning of § 1988 the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Association v. Garland Independent School District,* ⸺ U.S. ⸺, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989).

Defendants do not dispute that plaintiffs obtained the relief that they sought in this litigation, but strongly urge that plaintiffs failed to satisfy the causal connection requirement because the political agitation for change pre-dated this lawsuit. However, the fact that forces from without this litigation were working to abolish at-large elections in favor of district elections is not dispositive of the prevailing party issue because the litigation need not be the sole cause of relief. *NAACP v. Wilmington Medical Center, Inc.,* 689 F.2d 1161 (3d Cir.1982), *cert. denied,* 460 U.S. 1052, 103 S.Ct. 1499, 75 L.Ed.2d 930 (1983).

"[P]laintiffs in voting rights cases are entitled to a fee award even when subsequent remedial action by the defendant effectively moots the controversy after the lawsuit has been filed." *Kirksey v. Danks,* 608 F.Supp. 1448, 1453 (D.C.Miss.1985); *see also, Clark v. Twp. of Falls,* 890 F.2d 625 (3d Cir.1989). Thus, to determine whether the institution of this suit is causally relat-

ed to the benefit obtained, we must decide "whether the litigation constituted a material contributing factor in bringing about the events that resulted in obtaining the desired relief. *Institutionalized Juveniles v. Secretary of Public Welfare,* 758 F.2d 897, 916 (3d Cir.1985). An out of court settlement does not necessarily preclude a finding of causal relationship. *See Maher v. Gagne,* 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980); *Ashley v. Atlantic Richfield Co.,* 794 F.2d 128, 131 (3d Cir.1986).

Plaintiffs assert that when this action was brought the enabling legislation was not certain to pass and even when enacted, there was no assurance that at-large elections would be abandoned in a subsequent referendum. Further, they contend that they sought and achieved significant relief beyond that which was contemplated or provided by the referendum of May 19, 1987. For example, the enabling legislation provided neither a timetable for implementing by-district elections, nor addressed the voting rights of plaintiffs.

The consent order, on the other hand, required the following procedures:

A. Appointment of the members of the Apportionment Commission by August 14, 1987;

B. A requirement that the Commission conduct public hearings, receive testimony and entertain alternate plans;

C. A requirement that the Commission submit a final apportionment proposal to the court on or before February 15, 1988;

D. A requirement that objections be filed with the court prior to a date certain;

E. An evidentiary and a fairness hearing to determine whether the plan satisfied the requirements of federal law;

F. A remand provision, if necessary; and

G. Continuing federal jurisdiction.

None of these important details was addressed by the General Assembly in the enabling legislation. Hence, according to plaintiffs, this litigation was the catalyst for a significant change and benefit to the citizens of the City of Pittsburgh and there-

fore plaintiffs have sustained their burden of establishing significance and causation under *Hensley.* 461 U.S. at 433, 103 S.Ct. at 1939.

Defendants attempt to distinguish the two principal cases on which plaintiffs rely to support their claim as prevailing parties. *Disabled in Action of Pennsylvania v. Pierce,* 789 F.2d 1016 (3d Cir.1986) was a class action by the handicapped against HUD and the General Services Administration for alleged denial of equal access to federal facilities in Philadelphia, Pennsylvania. After the district court denied defendants' motion to dismiss, the parties entered into a settlement agreement whereby defendants agreed, *inter alia,* to provide access to the main entrance for the handicapped. Defendants opposed a subsequent fee petition arguing that access was provided for handicapped persons at another entrance to the building prior to the commencement of the civil action and thus, the agreement to provide access at the main entrance was gratuitous.

The Court of Appeals disagreed and held that under the standards promulgated pursuant to the Architectural Barriers Act, 42 U.S.C. §§ 4151–4157 (1982), main entrance access was required and therefore the suit was a catalyst for the vindication of the access rights of the handicapped and supported a finding of causal relationship.

Here, defendants argue, the catalyst for change to by-district elections was the referendum on the ballot resulting from the enabling legislation, which had been introduced in the General Assembly prior to this litigation, whereas in *Disabled in Action,* there was no indication that HUD would have provided access to the main entrance absent the lawsuit.

In *Kirksey v. Danks,* 608 F.Supp. 1448 (D.C.Miss.1985), also cited by plaintiffs, a class sought to change the form of government from the at-large election of council members to by-district elections in Jackson, Mississippi. The plaintiffs alleged, as did plaintiffs here, that at-large elections diluted black voting strength in violation of Section 2 of the Voting Rights Act, the Fourteenth and Fifteenth Amendments, and 42 U.S.C. § 1983. No black had been elected to the city council in Jackson since 1912 when at-large elections were adopted despite a black population of 47 percent. A 1977 referendum resulted in retention of at-large elections.

On the same day the trial was scheduled to commence, a referendum was voted upon in Jackson and the majority of the voters elected to change to by-district elections, thus accomplishing the goals of the lawsuit. The district court conducted "an intensely factual pragmatic ... [inquiry] involving an analysis of the chronology of events." 608 F.Supp. at 1453. The court held that the lawsuit was a "substantial factor" in producing the referendum result. In reaching that conclusion, the court relied upon newspaper accounts of the litigation and the reaction of voters and officials as well as the events leading up to the referendum that was placed on the ballot at the mayor's urging.

We agree with defendants that the chronology of events in *Kirksey* differ from the facts that confront us here. Here, the legislative movement was underway to bring about change in the method of electing council persons before this action was filed, and plaintiffs have failed to present any evidence from any source to support their theory that the bills in the General Assembly would not have been enacted but for this lawsuit. Nor can we conclude that the change would not have been supported by the voters but for this litigation. To the contrary, under-representation of blacks on City Council in Pittsburgh was a topic of discussion and an issue of concern for area politicians and some citizens before this action was filed. *See* Affidavit of Fontana, Exhibit F.

We hold that plaintiffs have failed to establish that the institution of this civil action was the proximate cause of the creation of by-district elections. The steps toward change by the Legislators and the voters of the City of Pittsburgh, which resulted in by-district elections, were the substantial contributing factors in implementing the change in the manner of electing council-persons in the City of Pitts-

burgh. However, we agree with plaintiffs that this litigation sought and achieved more than a mere change to by-district elections. Without more, by-district elections did not assure plaintiffs the voting power to elect a proportionate number of representatives of their choice to City Council. The racial diversity in the City is such that the voting districts could have been drawn to produce less than the two districts with a majority of black citizens, as achieved by the apportionment process. Indeed, the apportionment plan that was adopted with two black majority districts required overstepping neighborhood boundaries that many citizens had sought to preserve. *See* Minutes of the Pittsburgh Apportionment Commission Meeting of February 2, 1988.

Defendants make no claim and presented no evidence that they had plans to make the voting rights of black citizens a priority in bringing about by-district elections. They merely assert that the desire and efforts for change to a by-district system were present before this action was filed. Yet, the hearings and minutes of the Apportionment Commission make clear that the Commission was greatly concerned with the review by this court of any plan and therefore a top priority was to create districts that complied with the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution. *See* Minutes of the Pittsburgh Apportionment Commission, Meeting of October 1, 1987 at 18–19; Meeting of October 28, 1987 at 5; Meeting of November 17, 1987 at 20, 27, 28 and 34; Meeting of January 5, 1988 at 30 and 34; Meeting of January 19, 1988 at 11, 13, 14 and 17; Meeting of February 2, 1988 at 2, 4, 10, 14 and 26; Meeting of February 4, 1988 at 18, 19 and 26–28; Meeting of February 11, 1988 at 3, 7 and 8.

We find that with regard to the creation of by-district elections, plaintiffs boarded the train just before it left the station, *see Posada v. Lamb County, Texas*, 716 F.2d 1066, 1071 (5th Cir.1983), but we hold that plaintiffs have prevailed to the extent that they achieved their goal of protecting the voting rights of black persons of the City of Pittsburgh and retained the jurisdiction of this court to protect such rights into the future. Defendants have offered no evidence that undermines the claim and proofs of plaintiffs that they are prevailing parties on the issue whether the districts that were drawn by the Apportionment Commission comply with the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the Constitution of the United States. We hold that plaintiffs have sustained their burden of proving that they succeeded in obtaining some of the relief on the merits of their claim and the relief that was obtained is a benefit that is causally linked to their lawsuit.

■ On March 17 and April 24, 1986, plaintiffs and various defendants executed stipulations whereby those defendants agreed not to contest the relief sought and plaintiffs would not seek fees and costs from those defendants. Thus, plaintiffs seek fees and costs from the City of Pittsburgh and the Allegheny County Democratic Committee only. They do not seek an award from the Republican City Committee or its Chairperson, Robert Binnie, the Allegheny County Board of Elections or its director, James Scanlon, or Allegheny County Commissioners Barbara Hafer, Thomas Foerster or Pete Flaherty.

We find that plaintiffs have failed to establish that they are prevailing parties against the Allegheny County Democratic Committee or Edward Stevens. There is simply no basis to conclude that these defendants were legally culpable, played any role in the litigation or that equitable considerations require that these parties should bear a portion of the fee award.

■ We find equity requires that the ultimate fee award should be borne by the City of Pittsburgh. The City filed an answer in which it denied paragraphs 1, 2, 8, 9, 11, 12, 13, 14, 15(a)(b) and (d), 16(a)(b)(c)(d) and (e), 17, 18, 19, 21, 22 and 23 of the complaint, attacked the jurisdiction of the court and urged that relief should be denied in its entirety. It then refused to agree on the issue of class certification; filed an answer to the motion for

preliminary injunction in which it defended, in part, the at-large system of electing council persons; filed a pre-trial statement in which it sought, at bottom, to maintain the status quo; and opposed the concept of continuing federal jurisdiction. We find therefore that the City of Pittsburgh is legally culpable for any subsequent fee award, that it was the major defendant in this action, that plaintiffs devoted their time to litigating against this party, and that equitable considerations require that we hold the City of Pittsburgh responsible for attorney fees and costs.

■ We turn now to the fees and costs to which plaintiffs may be entitled. The Supreme Court has instructed that "the degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all." *Texas State Teachers Association v. Garland Independent School District,* —— U.S. ——, 109 S.Ct. 1486, 1492, 103 L.Ed.2d 866 (1989). The hours spent on that portion of the claim on which plaintiffs failed to prevail must be excluded from our calculations of a reasonable fee. *Hensley v. Eckerhart,* 461 U.S. 424, 440, 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40 (1983). Specifically, plaintiffs are not entitled to most of the fees and costs relating to preparation for the hearing on the preliminary injunction because the referendum mooted much of the relief that was sought at that time. *See,* transcript of conferences dated Feb. 13 and June 4, 1987.

We have reviewed the fee petition submitted by plaintiffs' counsel and we are unable to determine the hours that are related to the issues on which plaintiffs have prevailed and those hours that relate to unsuccessful claims. In particular, we are unable to determine the reasonable hours that were expended in assuring that plaintiffs' rights were protected in the consent decree, the apportionment process, the fairness hearings and thereafter. Obviously, plaintiffs' counsel did not have the benefit of our ruling when the petition was prepared and therefore we will require counsel to submit an amended petition with appropriate deletions. We note however that the original fee petition failed to comply with the teachings of the Court of Appeals.

An amended petition shall be submitted and verified on behalf of each lawyer that is seeking a fee, and submitted to the court within 60 days. Counsel shall set forth on each page on a line-by-line basis the following information: Date—Specific Nature of Work—Hours Expended—Fee Claimed.

The costs, if any, shall be itemized with particularity with respect to the claims on which plaintiffs have prevailed, and included with the fee petitions.