METROPOLITAN PITTSBURGH CRU-
SADE FOR VOTERS, Thomas E.
Smith, Florence Bridges, Roy A.
Holmes, Reginald D. Plato, Isaac J.
Saxon, Claude J. Jones, Isaac Wade,
Ronald L. Suber and Marshall Ross

v.

CITY OF PITTSBURGH, PENNSYLVA-
NIA, a Municipal Corporation, Richard
Caliguiri, Mayor, Eugene DePasquale,
Ben Woods, Mark Pollock, Sophie Mas-
loff, Michelle Madoff, Richard Givens,
Stephen Grabowski, Jack Wagner,
James O'Malley, Members of the Pitts-
burgh City Council, Allegheny County
Board of Elections, Tom Foerster, Pete
Flaherty, Barbara Hafer, Commission-
ers, Allegheny County Democratic
Committee, Edward Stephens, Chair-
man, Republican City Committee, Rob-
ert Binnie, Chairman, Allegheny Coun-
ty Department of Elections, James
Scanlon, Director.

Metropolitan Pittsburgh Crusade for Vot-
ers, Thomas E. Smith, Roy A. Holmes,
Reginald D. Plato, Isaac J. Saxon,
Claude J. Jones, Isaac Wade, Ronald L.
Suber and Marshall Ross, Appellants.

No. 91–3550.

United States Court of Appeals,
Third Circuit.

Argued April 6, 1992.

Decided May 14, 1992.

Vincent R. Fontana (argued), Wilson, El-
ser, Moskowitz, Edelman & Dicker, New
York City, Robert B. Smith, City of Pitts-
burgh, Dept. of Law, Pittsburgh, Pa., for
appellees City of Pittsburgh, Pa., a mun.
corp., Richard S. Caliguiri, Mayor, Eugene
DePasquale, Ben Woods, Mark Pollock, So-
phie Masloff, Michelle Madoff, Richard Giv-
ens, Stephen Grabowski, Jack Wagner and
James O'Malley, Members of Pittsburgh
City Council.

Thomas J. Henderson (argued), Frank R. Parker, James J. Halpert, Lawyers' Committee for Civil Rights, Washington, D.C., for all appellants.

Samuel Issacharoff, Austin, Tex., for appellant Metropolitan Pittsburgh Crusade for Voters.

Before GREENBERG and SCIRICA, Circuit Judges and DEBEVOISE, District Judge.*

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This is a dispute over the denial of certain portions of plaintiffs' request for attorneys' fees in a voting rights class action. After legislation and a referendum achieved much of the relief sought in the class action, the parties entered into a consent decree. Subsequently, plaintiffs sought attorneys' fees as "prevailing parties" under 42 U.S.C. §§ 1973*l* (e) and 1988. Plaintiffs now appeal those portions of the district court's award of attorneys' fees which partially denied them prevailing party status, *Metropolitan Pittsburgh Crusade for Voters v. City of Pittsburgh*, 727 F.Supp. 969, 973–74 (W.D.Pa.1989), and denied their request for a "risk enhancement." Because we believe the district court did not apply the correct legal standard in deciding whether appellants were prevailing parties in this factually complex case, we will reverse in part and remand. However, we will affirm the district court's denial of a risk enhancement.

## I.

In deciding who is a prevailing party when extrajudicial relief renders legal claims moot, courts look to the chronology of events leading to resolution of the dispute. *See, e.g., Morrison v. Ayoob*, 627 F.2d 669, 672 (3d Cir.1980); *Posada v. Lamb County*, 716 F.2d 1066, 1072 (5th Cir.1983). Accordingly, we begin with a brief history of the city of Pittsburgh's transition from at-large to by-district election of city council members.

### A.

Pittsburgh maintained at-large elections for its nine-member city council from 1911 to 1987. During this time, only six black members were elected to the city council. When this class action was commenced in 1986, twenty-four percent of the population of Pittsburgh was black, and the city council had no black members.

In the decade preceding this litigation, several attempts were made to change the system for electing city council members from at-large to by-district. In 1974 the Pittsburgh Home Rule Charter Study Commission drafted a mixed at-large/by-district plan, which was eventually dropped because of opposition from Democratic party leaders. In 1981 a referendum was submitted to Pittsburgh voters giving them the option of retaining the existing at-large system, adopting a mixed at-large/by-district plan, or establishing a pure by-district approach. Many prominent politicians, including Mayor Richard Caliguiri and city council members Ben Woods, Sophie Masloff, James O'Malley, Robert Stone, and Eugene DePasquale, lent their verbal and financial support to retention of the at-large system. The voters, including those in all but one of the predominantly black wards, chose to retain at-large elections.[1]

In 1982 Pittsburgh voters petitioned for another referendum authorizing the adoption of by-district elections. By-district opponents, led by council member Woods, attempted to block the referendum by filing suit in state court alleging failure to comply with the Home Rule Charter. Their efforts succeeded when the Court of Common Pleas held that because the adoption

---

* The Honorable Dickinson R. Debevoise, United States District Judge for the District of New Jersey, sitting by designation.

1. The result of the referendum was complicated somewhat by the fact that both the pure by-district and pure at-large options received more "yes" votes than "no" votes. Because the at-large option received the largest number of "yes" votes, it was adjudged to have prevailed. The confusing, three-option referendum was dubbed a "three-headed monster" by the local press.

of by-district elections would constitute a change in the form of government, it could be effected only through a government study commission. A year later the city council considered another proposal for a referendum on by-district elections, but decided not to pursue it after the city solicitor rendered an opinion that the Court of Common Pleas' ruling was controlling.

In 1983 by-district proponents introduced legislation in the city council to adopt by-district elections under § 302 of the Home Rule Charter, which purported to give the council the power to alter the method of election of council members. At the request of council member Richard Givens, an opponent of by-district elections, the city solicitor issued an opinion maintaining that § 302 was invalid under state law.

In 1985 council member William Robinson, the only black council member at the time, introduced a bill calling for a referendum on the creation of a government study commission to authorize the adoption of by-district elections. While the bill was pending, Robinson lost in the Democratic primary. Robinson's defeat made an all-white city council a virtual certainty.[2] Robinson's referendum bill was defeated by an evenly divided vote: council members Stone, Woods, O'Malley, and Masloff voted against the bill; Robinson, Madoff, Jack Wagner, and Stephen Grabowski voted for it; and Givens was absent and did not vote.

In October 1985 State Representative Thomas Murphy introduced a bill in the Pennsylvania General Assembly to amend the Home Rule Charter so that Pittsburgh could adopt by-district elections by referendum without first establishing a government study commission. The bill had not been reported out of committee at the time of the November election.

In November 1985 Mayor Caliguiri announced for the first time that he would support a mixed at-large/by-district plan. In late December 1985 the Murphy bill passed the Pennsylvania House of Representatives. Before its passage, however, the bill had been amended to allow referenda to encompass changes in the size of the city council and mixed at-large/by-district systems. The Senate recessed without acting on the bill.

### B.

On January 22, 1986, appellants, the Metropolitan Pittsburgh Crusade for Voters and nine individual voters, filed this class action in federal district court on behalf of all black residents of Pittsburgh against the city, its mayor and city council members, and officials responsible for conducting city elections. In their complaint, appellants alleged that the at-large system of electing city council members violated section 2 of the Voting Rights Act of 1965, the Fourteenth and Fifteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983. They sought a declaration that at-large elections unlawfully diluted black voting strength, an injunction preventing appellees from conducting future at-large elections, and an order requiring the adoption of a by-district plan.

The day after the suit was filed, council member Masloff, a long-time opponent of by-district elections, told *The Pittsburgh Press* that her position was softening. Masloff said that the city's election process was a matter for the legislature and not the federal courts, and also stated, "More and more, I'm leaning toward [by-district elections]. I still don't think it's good, but it seems like everyone is for it. If it's what the people want, so be it."[3]

---

**2.** Although one black Republican candidate for city council, Elmer McClung, remained in the general election, Democrats comprised a 6–to–1 majority of the city's registered voters. Since 1911 only one Republican had served on the city council. McClung in fact lost in the November, 1985 general election, which yielded an all-white city council.

**3.** On page 7 of its July 12, 1990 opinion and order, the district court stated that the newspaper articles were "probative and material in determining the chronology of events as they unfolded in the quest to switch from at-large to by-district elections in the City of Pittsburgh." *Cf. Posada v. Lamb County,* 716 F.2d 1066, 1072 (5th Cir.1983) ("Clues to the provocative effects of the plaintiffs' legal efforts are often best gleaned from the chronology of events.").

Approximately a month after the suit was filed, the city council voted 6–3 to hire a New York law firm to defend the suit at an estimated cost of $75,000. Council members Madoff, Masloff, and Mark Pollock voted against the expenditure.

At a pretrial conference held in March 1986, the district court ordered, contrary to usual practice, that all discovery be made available to the public and set a trial date of February 23, 1987. The court also raised the possibility of settlement, but this was rejected by appellees. Although it was noted that the Murphy bill (which lay dormant in the Pennsylvania Senate) might eventually effectuate the relief sought, the parties apparently did not view the Murphy bill as a realistic means of resolving the dispute at that time. Following this conference, appellants undertook extensive discovery over the course of the next ten months.

In June 1986 the Local Government Committee of the Pennsylvania Senate scheduled hearings on the Murphy bill. This sparked a flurry of political activity in Pittsburgh, which culminated in the mayor's unexpected endorsement of the Murphy bill. According to *The Pittsburgh Press*, Mark Zabierek, an aide to Mayor Caliguiri, attributed the mayor's support to two factors: "the absence of black representation on council and a pending federal court law suit challenging the at-large election system." A week later, the city council also voted to endorse the bill. Lawrence Dunn, then the Chair of the Allegheny County Republican Committee and a lobbyist for by-district elections, attributed these changes of heart "entirely to the fact that the lawsuit was brought and was being pursued."

Despite this newly found support for the bill, it was not voted out of the Local Government Committee before the Senate adjourned on July 1, 1986. A *Pittsburgh Press* editorial stated that "behind-the-scenes political pressures prevented Senate action on this proposal." The editorial expressed the view that Senate action on the bill later that year was "unlikely," but cited other means, including this action, as possible solutions to the lack of black representation on the city council.

In September 1986 the Murphy bill passed the Pennsylvania General Assembly and, on November 25, 1986, was signed into law, effective January 1, 1987. Representative Murphy submitted a verified statement that "[t]he fact that this lawsuit was pending was an important factor in my efforts to overcome [council members O'Malley's and Woods'] opposition to the Bill and persuade legislators to act favorably on the Bill.... [R]esolution of the matter through legislation and a referendum was viewed as a far more preferable route than having the matter decided and controlled by the federal court."

Pursuant to the new act, a referendum was scheduled for May 19, 1987, giving Pittsburgh voters the opportunity to decide the method by which the city council would be elected. After the Murphy bill was passed by the legislature but before it was signed into law, Mayor Caliguiri attempted to settle this action by proposing an expansion of the city council to eleven members, seven to be elected by districts and four to be elected at-large. Although the mayor's proposal met with some support from city council members, appellants promptly rejected it, because they believed the nine single-member district plan sought in their complaint would best reflect black voting strength. Following appellants' rejection of the mayor's 7–4 plan, the Allegheny County Republican Committee abandoned its own 6–3 plan and endorsed the 9–0 by-district plan sought by appellants. City Controller Tom Flaherty and council member Madoff also went from supporting a mixed plan to supporting a pure by-district plan.

The city council initially adopted four referendum options: 7–0 (seven single-member districts), 9–0 (nine single-member districts), 7–2 (seven single-member districts, two at-large), and 0–9 (nine at-large). Council member O'Malley attempted unsuccessfully to place the mayor's 7–4 proposal on the ballot. The council then eliminated the 7–2 option, sending the 7–0, 9–0, and 0–9 options to the mayor for approval. May-

or Caliguiri vetoed only that portion of the proposed referendum which contained the 9–0 by-district option sought by appellants, leaving two options: adoption of seven single-member districts or retention of nine at-large districts.

The mayor's action received much criticism in the local press. By a 6–3 vote, the city council overrode the mayor's veto, and restored the 9–0 by-district option to the ballot. This action, however, created a referendum decried in *The Pittsburgh Press* as a new "three-headed monster," which "promise[d] to be as confusing as its predecessor of five years ago."

Finally, on January 12, 1987, the city council voted to eliminate the 7–0 by-district plan from the ballot, giving voters a "straight up and down" choice between the existing 9–0 at-large plan and a 9–0 by-district plan. In expressing his support for a two-issue referendum, council member DePasquale stated, "I am following the wishes of my good friends in the black community. For that reason and no other am I changing my vote." Council member Madoff characterized the decision as a "change of heart among the powerbrokers."

## C.

On February 3, 1987, appellants moved for a preliminary injunction enjoining the at-large city council primary scheduled for May 1987. In support of their motion, appellants filed four expert witness reports and nine lay witness affidavits on the history of voting discrimination in Pittsburgh. At a status conference held ten days later, the district court questioned the need for injunctive relief in light of the upcoming May 19 referendum. The court stated that failure of the by-district referendum would strengthen appellants' case "enormously," and passage would lead to the submission

by the reapportionment commission of its redistricting plan for approval by the district court. Therefore, the district court continued appellants' motion for preliminary relief, and consolidated a hearing on the motion with an expedited trial on the merits, which it rescheduled for June 1, 1987.

On May 19, 1987, residents of Pittsburgh voted to amend the Home Rule Charter to provide for by-district elections for city council members.[4] Unlike in 1981, city and Democratic party officials did not mount a campaign in support of the at-large option. Jonathan Robison, a district election lobbyist, stated in an affidavit:

There is no doubt in my mind that the looming presence of this lawsuit was a critical factor to the success of the 1987 referendum. It was particularly important at three critical junctures: in our effort to get the enabling legislation through the Legislature; in the framing of the resolution questions in City Council; and, in the success of the vote on the resolution itself.

Shortly thereafter, the district court ordered briefing on whether this litigation was moot. At a conference held less than a week before trial was scheduled, the court ruled that appellees had the burden of proving mootness. Rather than requesting a hearing to present evidence on that question, appellees offered to submit to a court-imposed apportionment process and schedule, provided appellants would agree not to proceed to trial. The parties agreed to a settlement on June 1, 1987, and a consent order was entered by the district court nine days later. Under this order, appellees admitted no liability for the alleged voting rights violations, and the parties agreed that the district court would retain jurisdiction over this matter until a redistricting plan was approved.

---

**4.** In his affidavit, plaintiff Thomas E. Smith testified:

When the votes were counted in the [May 19, 1987] referendum, the black community voted overwhelmingly for district-elections [sic] at a rate of 80% to 90%.... The dramatic shift in the black vote on the referendum [from 1981, when the majority of the black community

supported at-large elections], which contributed substantially to the victory for district elections, can only be explained as a result of the lawsuit's presentation of the issue as one of historical and continuing discrimination and the way in which at-large elections cancelled out the black vote.

A final apportionment proposal was eventually submitted to the district court. After two fairness hearings during which objections were heard, the court determined that the redistricting plan provided black residents of Pittsburgh with a proportionate opportunity to elect city council members in accordance with section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution.

### D.

Appellants subsequently filed a petition for attorneys' fees in the amount of $332,828.50 to cover three years of discovery and trial preparation. They also sought a 100% contingent risk enhancement on attorney time, and a 33% increase for delay in recovery. Appellants moved for partial summary judgment on the issue whether they were prevailing parties under 42 U.S.C. §§ 1973$l$ (e) and 1988.

On December 27, 1989, the district court issued an opinion and order granting in part and denying in part appellants' motion for summary judgment. The court determined that appellants were not prevailing parties as to the adoption of by-district elections because this lawsuit was not "the proximate cause" of the election reform, but found that appellants were prevailing parties to the extent they sought to protect the voting rights of black residents of Pittsburgh through this litigation and the court retained jurisdiction to achieve that aim in the wake of the May 19 referendum. *Metropolitan Pittsburgh Crusade for Voters*, 727 F.Supp. at 973–74. The district court ordered appellants to submit an amended and verified petition for attorneys' fees in accordance with its opinion.

Appellants filed a motion for further proceedings and a ruling on whether their lawsuit was "a material factor" in bringing about by-district elections for city council members in Pittsburgh. In support of their motion, appellants filed additional affidavits and numerous newspaper accounts, which were admitted into evidence, describing this lawsuit and the political process culminating in the May 19 referendum. On July 12, 1990, the district court issued a memorandum opinion and order reaffirming its prior ruling. The court again directed appellants to submit an amended petition for attorneys' fees.

On July 23, 1991, the district court issued a memorandum opinion and order awarding appellants $113,280.84 in attorneys' fees and denying, without explanation, their request for a risk enhancement. This appeal followed.

### II.

### A.

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. §§ 1973j(f) and 1983. We have appellate jurisdiction under 28 U.S.C. § 1291. At issue in this appeal is whether the district court applied the proper legal standard in determining whether appellants were prevailing parties under 42 U.S.C. §§ 1373$l$ (e) and 1988, and whether the district court properly denied appellants' request for a risk enhancement.

We have plenary review of whether the district court applied the proper legal standard for "prevailing parties" under 42 U.S.C. §§ 1973$l$ (e) and 1988. *Wheeler v. Towanda Area Sch. Dist.*, 950 F.2d 128, 129 (3d Cir.1991). We review the district court's denial of appellants' request for a risk enhancement of their award of attorneys' fees for abuse of discretion. "We may ... find an abuse of discretion when the trial court uses improper standards or procedures in determining fees, or if it does not properly identify the criteria used for such determination." *Silberman v. Bogle*, 683 F.2d 62, 65 (3d Cir.1982).

### B.

Sections 1973$l$ (e) and 1988 of Title 42 of the United States Code authorize federal courts to award "reasonable attorney's fees" in civil rights actions to the "prevailing party." 42 U.S.C. §§ 1973$l$ (e), 1988

(1988).[5] The "prevailing party" standard in this circuit is well established. In *Disabled in Action of Pennsylvania v. Pierce*, 789 F.2d 1016, 1019 (3d Cir.1986), we said that the test "is whether the fee petitioner achieved some of the benefit sought by the party bringing the suit."

As we elaborated in *Dunn v. United States*, 842 F.2d 1420, 1433 (3d Cir.1988) (emphasis added) (citations omitted):

The test for prevailing party status is essentially a twofold inquiry. Although framed in various ways, the first part of the test "is whether plaintiff achieved some of the benefit sought by the party bringing the suit." The second part of the prevailing party test is that of causation, *i.e., whether the "litigation 'constituted a material contributing factor in bringing about the events that resulted in the obtaining of the desired relief.'"* Thus, the plaintiff's lawsuit need not be the sole cause of defendant's action. Moreover, ... *a district court must apply the most expansive definition of causation.* The district court must determine whether the plaintiff's lawsuit is causally linked to the relief obtained, *i.e.,* whether it changed the defendant's conduct or action to be undertaken.

"[A] plaintiff is a prevailing party to the extent extrajudicial relief makes legal claims moot." *Institutionalized Juveniles v. Secretary of Public Welfare*, 758 F.2d 897, 911 (3d Cir.1985). Thus, courts in other jurisdictions have conferred "prevailing party" status upon plaintiffs in voting rights actions where a subsequent referendum mooted the underlying litigation and causation was found to exist. *See, e.g., Kirksey v. Danks*, 608 F.Supp. 1448 (D.Miss.1985).

5.  *See Leroy v. City of Houston*, 831 F.2d 576, 579 n. 4 (5th Cir.1987) ("42 U.S.C. § 1988 ... should be construed consistently with [42 U.S.C. § 1973*l*(e)].").

6.  Appellants presented the verified statement of Representative Murphy, which reads:
    The fact that this lawsuit was pending was an important factor in my efforts to overcome [council members O'Malley's and Woods'] opposition to the Bill and persuade legislators to act favorably on the Bill. ... [R]esolution of

Before undertaking its analysis, the district court properly stated the legal standard for a "prevailing party":

The test established by the United States Court of Appeals for the Third Circuit to determine prevailing party status is "whether plaintiff achieved some of the benefit sought by the party bringing suit." In applying this standard, we must follow two steps. We must compare the relief sought with that actually obtained and then determine the causal connection between the relief obtained and the litigation. "[A]t a minimum, to be considered a prevailing party within the meaning of § 1988 the plaintiff must be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant."

727 F.Supp. at 972 (citations omitted). However, the standard the court formulated and the one it actually applied are altogether different. In holding that appellants were not prevailing parties on the adoption of by-district elections, the court reasoned:

Here, the legislative movement was underway to bring about change in the method of electing council persons before this action was filed, and plaintiffs have failed to present any evidence from any source to support their theory that the bills in the General Assembly would not have been enacted *but for* this lawsuit.[6] Nor can we conclude that the change would not have been supported by the voters *but for* this litigation. To the contrary, under-representation of blacks on City Council in Pittsburgh was a topic of discussion and an issue of concern for area politicians and some citizens before this action was filed.

the matter through legislation and a referendum was viewed as a far more preferable route than having the matter decided and controlled by the federal court.
Although this testimony may not "support [appellants'] theory that the bills in the General Assembly would not have been enacted *but for* this lawsuit," it is probative on whether the lawsuit was a "material contributing factor" in the passage of the Murphy bill.

We hold that plaintiffs have failed to establish that the institution of this civil action was *the proximate cause* of the creation of by-district elections.

727 F.Supp. at 973 (emphasis added) (citations omitted).

The district court's July 12, 1990 opinion and order reaffirming its prior ruling is less explicit. There, the court stated that "to be considered prevailing parties, plaintiffs must not only obtain some of the relief sought, but they must also obtain the relief under circumstances that is [sic] 'causally linked to the prosecution of the complaint.'" *Metropolitan Pittsburgh Crusade for Voters v. City of Pittsburgh*, No. 86–173, slip op. at 10–11 (W.D.Pa. July 12, 1990) (citation omitted). The district court also noted its previous finding that appellants "had failed to establish that the action was *the proximate cause* of the change to by-district elections and therefore they were not prevailing parties to that extent," and gave no indication that it viewed that standard to be improper. *Id.* at 3 (emphasis added).

■ A requirement that the lawsuit be a "but for" cause or "the proximate cause" of the benefit achieved is significantly more stringent than the "material contributing factor" test enunciated above. *Cf. Cipollone v. Liggett Group, Inc.*, 893 F.2d 541, 561–62 n. 17 (3d Cir.1990) ("[A] 'but for' test requires more direct linkage between defendant's conduct and the injury than does the 'substantial factor' instruction given by the district court."). *See also United Handicapped Federation v. Andre*, 622 F.2d 342, 346–47 (8th Cir.1980) ("It is not necessary for the plaintiffs' lawsuit to be the sole cause or even the primary cause of defendants' decision to settle."). In determining whether plaintiffs are prevailing parties under 42 U.S.C. §§ 1973*l* (e) and 1988, "a district court must apply the

most expansive definition of causation." *Dunn*, 842 F.2d at 1433.

This court has looked to the sequence of events in determining whether a lawsuit is a material factor in bringing about a desired change. *See Morrison*, 627 F.2d at 672. This approach is in accord with that followed in other circuits. *See, e.g., Posada*, 716 F.2d at 1072 ("Clues to the provocative effects of the plaintiffs' legal efforts are often best gleaned from the chronology of events: defendants, on the whole, are usually rather reluctant to concede that the litigation prompted them to mend their ways.").

We hold that the district court did not apply the proper standard in deciding whether appellants were prevailing parties as to the adoption of by-district elections. Therefore, we will reverse and remand for further consideration of that question.[7]

### C.

■ Appellants also contend that the district court erred in denying their request for a risk enhancement of their award of attorneys' fees because it did not make factual findings in accordance with Fed. R.Civ.P. 52(a). Because the district court's decision addressed appellants' motion for partial summary judgment, Rule 52(a)'s requirement of findings of fact may not apply. *See* Fed.R.Civ.P. 52(a) ("Findings of fact are unnecessary on decisions of motions under ... Rule 56...."). However, other circuits have applied Rule 52(a)'s requirement of factual findings to district court orders governing the award of attorneys' fees, *see Ithaca Corp. v. Dooley*, 582 F.2d 3, 4 (5th Cir.1978), and have reversed and remanded the denial of fee enhancements where factual findings were far more detailed than those here, *see NAACP v. City of Evergreen*, 812 F.2d 1332, 1336–37 (11th Cir.1987).

---

**7.** Appellees contend that the district court erred in holding that appellants were prevailing parties in vindicating the voting rights of the black citizens of Pittsburgh and in the district court's retention of jurisdiction to protect those rights. Because appellees did not file an appeal or cross appeal, this contention is not properly before us. "It is well settled that '[w]hat [an appellee]

may not do in the absence of a cross-appeal is to "attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary...." This rule is inveterate and certain.' *Airco Indus. Gases, Inc. v. Teamsters Health and Welfare Pension Fund*, 850 F.2d 1028, 1034 (3d Cir.1988) (citations omitted).

More importantly, this court has held that we may "find an abuse of discretion when the trial court ... does not properly identify the criteria used" in determining attorneys' fees. *Silberman v. Bogle*, 683 F.2d 62, 65 (3d Cir.1982); *accord Inmates of the Allegheny County Jail v. Wecht*, 901 F.2d 1191, 1201 (3d Cir.1990) ("We find that the district court's summary procedure represents an abuse of discretion, as the present record provides us with no basis for intelligent review of the district court's award."). Therefore, except in cases where a request for a risk enhancement clearly lacks merit, a district court's failure to make factual findings in support of its denial of a risk enhancement may constitute an abuse of discretion. Nevertheless, we agree with the district court that no risk enhancement is appropriate here.

■ In *Vargas v. Hudson County Board of Elections*, 949 F.2d 665, 676 (3d Cir.1991), we stated that in determining whether a risk enhancement is proper, the pertinent inquiry is whether "the prevailing party would have faced substantial difficulties in finding counsel in the absence of an enhancement." Ordinarily, we would remand to the district court for factual findings on this issue. However, because our review of the record satisfies us that a risk enhancement is not warranted in this case, we will affirm the district court's denial of a risk enhancement. *See Pullman–Standard v. Swint*, 456 U.S. 273, 292, 102 S.Ct. 1781, 1792, 72 L.Ed.2d 66 (1982) (remand unnecessary where "the record permits only one resolution of the factual issue").

### III.

For the foregoing reasons, we will affirm the district court's denial of a risk enhancement, and will reverse and remand the district court's partial denial to appellants of prevailing party status under 42 U.S.C. §§ 1973*l*(e) and 1988 for further proceedings consistent with this opinion.